In re UNIVERSITY MEDICAL
CENTER, Debtor.

UNIVERSITY MEDICAL CENTER and
The Official Creditors' Committee,
Plaintiffs,

v.

Otis BOWEN, Secretary of the United
States Department of Health and Hu-
man Services and Blue Cross of Great-
er Philadelphia, Defendants.

Bankruptcy No. 88–00003S.
Adv. No. 88–0838S.

United States Bankruptcy Court,
E.D. Pennsylvania.

Dec. 7, 1988.

Thomas H. Tropp, Philadelphia, Pa., for debtor.

Virginia Powel, Asst. U.S. Atty., Philadelphia, Pa., for Bowen.

David Bongiovanni, Philadelphia, Pa., for Blue Cross.

William G. Frey, Mark H. Gallant, Philadelphia, Pa., for Committee.

Richard Gorelick, Philadelphia, Pa., for Blue Cross.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

■ Before us are (1) A motion by the Secretary of the United States Department of Health and Human Services (hereinafter referred to as "HHS") seeking relief from the automatic stay in the above-captioned main bankruptcy case in order that it can recoup pre-petition Medicare overpayments to the Debtor-hospital against post-petition Medicare payments otherwise due to the Debtor; and (2) An adversary proceeding brought by the Debtor, seeking recovery of the post-petition Medicare payments which HHS has withheld and damages for HHS's alleged violation of the automatic stay in effecting recoupment in the past and at present. The issues raised are difficult ones, but ones which, for the most part, we already resolved in our Opinion of August 12, 1988, in *In re St. Mary Hospital*, 89 B.R. 503 (Bankr.E.D.Pa.1988). Not surprisingly, we follow our decision in *St. Mary*, and hold that HHS does not have a right to effect recoupment in these circumstances. The only new issue presented is our treatment of HHS's refusal to return $15,000.00 already recouped from the Debtor and its persistence in declining to remit post-petition payments to the Debtor in the direct face of the *St. Mary* precedent against it. We hold that, under 11 U.S.C. § 362(h), HHS is obliged to return $15,-000.00 and compensate opposing counsel for all reasonable attorney's fees accrued as a result of maintaining these matters after August 12, 1988, in addition to directing HHS to pay all post-petition Medicare payments to the Debtor. We also hold that the Debtor is entitled to pre-judgment interest on the $15,000.00 and on the post-petition payments which HHS has withheld.

### B. PROCEDURAL HISTORY

The underlying voluntary Chapter 11 bankruptcy case was filed on January 4, 1988. The Debtor, as Findings of Fact 6–11, pages 414–415 *infra*, reveal, was initially oblivious to its potential rights to resist HHS's assertions of a right to recoup past Medicare overpayments from present payments for Medicare benefits. It was not until June 17, 1988, over 2½ months after the Debtor had ceased doing business, that it became enlightened as to its potential rights to resist HHS's recoupment efforts and filed the instant adversary proceeding. On August 10, 1988, the Official Unsecured Creditors' Committee (hereinafter "the Committee"), represented by the same firm that served as special counsel in the *St. Mary* litigation described above, intervened as a party-plaintiff.

On July 8, 1988, belatedly becoming aware that its effectuation of recoupment may have been presumptuous, HHS filed a motion for relief from the stay in the main bankruptcy case, requesting this court to ratify its past recoupment activities as well as allow it to continue such activity in the future.

The parties agreed to present both matters to us together in a consolidated trial on September 22, 1988. At the commencement of the trial, they submitted a Stipulation of Facts which, although filled out somewhat by the following trial, contained most of the pertinent facts. Although the parties supplemented the Stipulation by post-trial Proposed Findings of Fact and Conclusions of Law submitted to us by November 7, 1988, we rely heavily upon the Stipulation in rendering our Findings of Fact. Conclusions of Law, with a Discussion of each issue, reduced in length by our

ability to incorporate our more extended treatment of most of the same issues in *St. Mary,* follows.

## C. FINDINGS OF FACT

1. Although BLUE CROSS OF PHILADELPHIA (hereinafter "BC"), the fiscal intermediary of HHS, was named as a party-defendant in the adversary proceeding, the parties agreed that HHS is the only real party-defendant in interest, and that BC was merely acting as an agent for HHS as to the facts described hereinafter, thereby justifying its dismissal as a defendant in the adversary proceeding.

2. The Plaintiff and HHS entered into a Health Insurance Benefits Agreement (hereinafter "the Benefits Agreement") on April 29, 1966, which, at all times thereafter, remained in effect.

3. The Debtor was overpaid by BC for Medicare services in the following amounts: 1985—$276,042.00; 1986—$470,894.00; and 1987—$65,447.00.

4. Although aware of the Debtor's bankruptcy filing a few days before, BC, by a letter of January 8, 1988, addressed to the Debtor, indicated that it would begin withholding all future Medicare payments to recoup the 1985 overpayment due unless payment of the overpayments were made in full or a request for an extended repayment agreement was received from the Debtor.

5. When no response was received from the Debtor in the next month, BC notified the Debtor, by letter of February 8, 1988, that it would begin withholding all future Medicare benefits as of February 10, 1988.

6. In furtherance of this policy, on February 18, 1988, BC withheld a payment of $58,000.00 otherwise payable to the Debtor under the Benefits Agreement. This action prompted authorized agents of the Debtor to meet that day with Stanley E. Kaimowitz, the BC official in charge of its recoupment activities. In that meeting, it was arranged that BC would allow the Debtor to repay the 1985 overpayment at a rate of $15,000.00 per month, provided that payments were made on the first day of each succeeding month, and provided that the Debtor submitted documentation to establish its need for such a repayment schedule.

7. Mr. Kaimowitz testified that he expressly advised the Debtor's agents that the aforementioned documentation must be submitted within two weeks. Raymond Kipping, the Debtor's administrator, testified that he was equally certain that no express time-limits had been set. This was the only disagreement between the parties' rendition of their dealings, and we need not resolve the difference because it is not significant to the outcome.

8. In light of the arrangement of that date, BC released the $58,000.00 previously withheld on February 18, 1988. On March 4, 1988, the Debtor remitted the first $15,000.00 payment pursuant to the arrangement and BC did not withhold any Medicare payments from February 19, 1988, until March 31, 1988.

9. The parties did not reduce the arrangement of February 18, 1988, to writing, and the Debtor neither sought court approval of this arrangement nor advised any other interested party, including the Committee, that it had made the arrangement.

10. Not having received the requested documentation to establish the need for a repayment schedule as of March 28, 1988, Mr. Kaimowitz informed the Debtor that, unless the complete documentation requested was received by March 31, 1988, BC would once again suspend all current Medicare payments to the Debtor.

11. On March 31, 1988, the Debtor remitted certain documentation to BC, but BC deemed that the submission was incomplete and began withholding all current Medicare payments once again.

12. On that same date, March 31, 1988, the Debtor closed its hospital.

13. The parties agreed that BC could and would make whatever calculations of payments were due and would have been remitted to the Debtor subsequent to March 31, 1988, after the court ruled as to

whether the recoupment effected by BC on behalf of HHS was permissible.

14. Neither the Debtor nor the Committee presented any evidence that the closing of the Debtor's hospital would have been averted had BC made all of the submissions of Medicare benefits, or that any other damages arose as a result, except the efforts of counsel for the Debtor and the committee in prosecution of this litigation.

15. The Committee has consistently taken the position that the $15,000.00 payment made to BC on February 18, 1988, should be returned to the Debtor, and the Debtor now takes this position as well.

D. CONCLUSIONS OF LAW/DISCUSSION

1. THE DEBTOR CANNOT BE HELD TO HAVE ASSUMED THE BENEFITS AGREEMENT WITH HHS, BECAUSE IT NEVER PRESENTED A FORMAL MOTION FOR COURT APPROVAL OF SAME WHICH WAS GRANTED BY THIS COURT AFTER NOTICE TO ALL INTERESTED PARTIES

In *St. Mary,* we assumed, without deciding, that a provider agreement similar to the Agreement in issue here was an executory contract. 89 B.R. at 507. In so holding, we acknowledged "a certain degree of force" to the debtor's "appealing argument" that HHS "is not seeking recoupment pursuant to an executory contract, but is merely attempting to pursue recoupment pursuant to federal statues." *Id.* at 507 n & 4. *See also In re Elegant Concepts, Ltd.,* 61 B.R. 723, 728 (Bankr.E. D.N.Y.1987) (obligations arising from a statute are not contractual in nature). Nevertheless, assuming *arguendo* that an executory contract was in issue, we stated, in *St. Mary,* that "we are disinclined to hold that a debtor has implicitly assumed an executory contract through actions short of presenting a formal motion to assume· such a contract to the bankruptcy court." *Id.* at 507.

■ We again emphasize that we could conceivably conclude that we are not dealing with an executory-contract situation

here at all, and that therefore 11 U.S.C. § 365 does not come into play at all. However, assuming *arguendo* that the Agreement *is* an executory contract, we note that the one area in which the facts are stronger in favor of HHS here than in *St. Mary* is that the actions of the Debtor here more strongly suggested that there had been an implicit assumption of an executory contract than in *St. Mary.* There, the Debtor consistently contended that HHS had no right to set off or recoup pre-petition overpayment from post-petition payments otherwise due to it. Here, the Debtor, apparently assuming initially that HHS had such a right, met with HHS on February 18, 1988, and orally arranged at that time to allow HHS to effect recoupment in the event that the Debtor failed to make the monthly payments of $15,000.00 towards its pre-petition 1985 overpayment obligation.

However, the Debtor here never took the step of presenting a formal motion to assume the Benefits Agreement of April 29, 1966, or to in any way perfect the oral arrangement which it had made with HHS by seeking approval of same from this court, which we deem a prerequisite to render the arrangement valid. Moreover, we would amend our above statement in *St. Mary* to require that not only must the debtor *present* a formal motion to the court to render such an arrangement valid, but this court must also *act* affirmatively upon it before an assumption of an executory contract or any post-petition agreement to pay a pre-petition obligation is binding upon a debtor. The instant factual situation illustrates why such formality is more than a technicality. The Committee, apparently far more conversant with the Debtor's rights in dealing with HHS than the Debtor itself, may well have and indeed most probably would have objected to the Debtor's assuming the Benefits Agreement and/or entering into the repayment arrangement with BC or HHS either as a condition to assumption of the Benefits Agreement or otherwise. Furthermore, even putting aside the fact that the Debtor could not be compelled to repay pre-petition

obligations as a condition of receipt of further benefits otherwise due under the Benefits Agreement, it is not clear that all interested parties and the court would have concurred that the Debtor's prospects of remaining in business were sufficiently bright to have justified saddling the Debtor with an obligation to pay such pre-petition obligations as a condition for receipt of future payments under the Benefits Agreement in any event. With the benefit of hindsight, we can observe that the Debtor survived as a going concern for only about six weeks after it negotiated the oral arrangement with HHS on February 18, 1988. Hence, again with 20–20 hindsight, we can observe that the Debtor gained relatively little benefit from the right to receive payments under the Agreement going forward.

HHS, by its agent BC, was clearly acting at its peril in negotiating with the Debtor and accepting funds pursuant to any such arrangement prior to the bankruptcy court approval of the arrangement. We therefore can attribute no significance to the Debtor's obviously voluntary, but merely oral, arrangement to assume the Benefits Agreement, and/or establish terms to repay the pre-petition obligation to reimburse HHS for Medicare overpayments. Consequently, the Debtor's alleged breach of that totally unenforceable oral arrangement has no significance. Certainly, this breach should not enhance HHS's rights to collect pre-petition overpayment obligations at this time.

   2. IN LIGHT OF 11 U.S.C. § 525(a), HHS CANNOT, IN ANY EVENT, COMPEL THE DEBTOR TO REPAY PRE–PETITION OBLIGATIONS AS A CONDITION FOR ASSUMING THE BENEFITS AGREEMENT AS TO FUTURE MEDICARE BENEFITS, AND IT MUST REMIT POST–PETITION PAYMENTS OTHERWISE DUE TO THE DEBTOR

HHS maintains that it is entitled to relief from the automatic stay to recoup pre-petition overpayment obligations of the Debtor against obligations to reimburse the Debtor for services post-petition and therefore avoid liability from the plaintiffs' claims against it in the adversary proceeding. At the heart of HHS's position is its contention that the Debtor cannot accept the post-petition benefits of the Benefits Agreement without also accepting all of the obligations of the Benefits Agreement, including exposure to recoupment for pre-petition obligations. However, in *St. Mary*, we rejected that argument as violative of 11 U.S.C. § 525(a). 89 B.R. at 510–13. We continue to believe, as we reasoned in *St. Mary*, that, even if the Benefits Agreement is an executory contract, the "burden" of requiring the Debtor to pay an otherwise dischargeable obligation to reimburse HHS for past overpayments as a condition to receive the "benefit" of rights otherwise enforceable by the Debtor under the Benefits Agreement in the future is an example of precisely the sort of governmental discrimination against debtors prohibited by § 525(a).

We conclude that HHS acted in violation of the automatic stay in withholding payments from the debtor otherwise due to it without obtaining relief from the stay. As we explained in *In re Boston Business Machines*, 87 B.R. 867, 870 (Bankr.E.D.Pa.1988); and *In re Clark*, 69 B.R. 885, 889–91, *modified*, 71 B.R. 747 (Bankr.E.D.Pa.1987), the stay, being automatic, attaches even when the debtor, by his own dereliction, fails to invoke it. The creditor's unawareness of even the debtor's bankruptcy filing, not to mention the application of the stay, was held insufficient to justify validation of acts performed in technical violation of the automatic stay in those cases. Here, BC, the agent of HHS, was admittedly aware of the Debtor's bankruptcy filing prior to its first act arguably in violation of the stay, *i.e.*, dispatch of the letter of January 8, 1988. Indeed, its actions thereafter, including dispatch of the later letter of February 8, 1988, and the negotiations to collect pre-petition indebtedness on February 18, 1988, appear directly calculated to permit HHS to recover pre-petition overpayments from the Debtor in the view of its perceived jeopardy in ever recovering such payments as a result of the Debtor's bankruptcy filing. Therefore, the

fact that the Debtor acceded to the overtures of BC to repay pre-petition obligations does not alter the fact that, in sending such letters and making an oral arrangement with the Debtor by which the Debtor would repay such obligations, HHS was acting in violation of the automatic stay, as provided in 11 U.S.C. §§ 362(a)(3), (a)(6), (a)(7).

Moreover, as in *St. Mary*, we will not allow HHS relief from the stay to pursue the Debtor hereafter. The action to recover such pre-petition obligations, be it characterized as a recoupment or a setoff, is violative of 11 U.S.C. § 525(a), and hence impermissible.

At this point, having ceased doing business, it does not appear to be the intention of the Debtor to assume the Benefits Agreement. HHS has brought no motion pursuant to 11 U.S.C. § 365(d)(2) to request the Debtor to promptly assume or reject the Benefits Agreement before us, as it did in *St. Mary*. *See* 89 B.R. at 513–14. Nevertheless, having ruled that HHS is not entitled to relief from the automatic stay to set off or recoup the Debtor's pre-petition overpayment obligations against its obligations to reimburse the Debtor post-petition for services under the Benefits Agreement, it must proceed to reimburse the Debtor for such services. The parties have agreed that BC will make the calculations of payments due in the event that we determine that HHS must pay for same. Since we conclude that HHS is in fact liable for these payments, we will direct that BC make the necessary calculations and remit payments for post-petition services to the Debtor. We will also assess pre-judgment interest against HHS in favor of the debtor on these payments, as an aspect of a penalty against HHS for withholding such payments, and because we believe that, in a breach of contract action, such an award is mandatory. *See, e.g., Black Gold Coal Corp. v. Shawville Coal Co.*, 730 F.2d 941, 943 (3d Cir.1984); *Liberty Mutual Ins. Co. v. Home Ins. Co.*, 583 F.Supp. 849, 856 (W.D.Pa.1984); and *In re Lessig Construction, Inc.*, 67 B.R. 436, 444–45 (Bankr.E.D. Pa.1986).

3. SINCE RECEIPT OF SAME VIOLATED THE AUTOMATIC STAY, HHS IS OBLIGED TO RETURN THE $15,000.00 PAID TO IT BY THE DEBTOR. IN ADDITION, SINCE HHS'S ACTIONS WERE CLEARLY WILLFUL AT ALL TIMES AFTER AUGUST 12, 1988, HHS IS LIABLE TO THE PLAINTIFFS FOR ALL REASONABLE COSTS AND ATTORNEY'S FEES EXPENDED BY THEM AFTER THAT DATE

In *Boston Business Machines, supra*, 87 B.R. at 870; and *Clark, supra*, 69 B.R. at 889–90, we held that any actions taken by a creditor in violation of the automatic stay are void. At the very least, such actions are certainly voidable by the debtor, at any time thereafter, unless the creditor can establish equities rendering such a holding unjust. *See In re Ward*, 837 F.2d 124, 126 (3d Cir.1988); and *In re Stephen W. Grosse, P.C.*, 84 B.R. 377, 383 (Bankr.E.D.Pa.1988).

HHS clearly accepted $15,000.00 from the Debtor in connection with its negotiations and arrangement with the Debtor attained in the course of actions which were in violation of the automatic stay. Therefore, it should disgorge this sum to the Debtor.

It is conceivable that HHS could argue that the $15,000.00 paid to it by the Debtor on March 4, 1988, was consideration received in connection with its arrangement of February 18, 1988, with the Debtor, whereby it released $58,000.00 in post-petition reimbursements to the Debtor and refrained from withholding any further reimbursements through March 31, 1988. However, the difficulty with this argument is that HHS had, pursuant to our reasoning in *St. Mary* and our reasoning set forth at pages 416–17 *supra* here, an obligation to continue post-petition payments to the Debtor in any event. Therefore, payment of the $58,000.00 returned to the Debtor and all of the other payments made to the Debtor through March 31, 1988, simply represented payment of obligations which HHS had to the Debtor in any event. The withholding of such payments would have

merely enhanced the liability of HHS to the Debtor, with additional interest, at this juncture. As a result, we conclude that there was in fact no consideration received by the Debtor in exchange for its $15,-000.00 remittance to HHS, and this sum, withheld in violation of the automatic stay, must be returned to the Debtor, also with pre-judgment interest.

Finally, the Plaintiffs urge this court to award them costs and attorneys' fees for prosecuting the adversary proceeding, pursuant to 11 U.S.C. § 362(h), which allows a party "injured by any willful violation of a stay" to recover "actual damages, including costs and attorneys' fees." Although the Plaintiffs appeared at times to suggest that HHS might be liable for extensive "actual damages," based upon the theory that the withholding of reimbursements led to the closure of the Debtor's hospital, the Plaintiffs failed to meet their necessary burden of proving same. *Compare In re Whitt,* 79 B.R. 611, 615–16 (Bankr.E.D.Pa. 1987). The payments were withheld only after the hospital closed in any event. In their post-trial submissions, the Plaintiffs therefore appear to justly restrict their demands to their costs and attorneys' fees in pursuing this proceeding.

Other courts have not been reluctant to impose costs and attorneys' fees upon HHS under § 362(h) for effecting recoupment or setoffs in post-petition Medicare payments otherwise due without first obtaining relief from the automatic stay. *See In re Advanced Professional Home Health Care, Inc.,* 82 B.R. 837, 844–45 (Bankr.E.D.Mich. 1988). *Cf. In re Memorial Hospital of Iowa County, Inc.,* 82 B.R. 478 (W.D.Wis. 1988) (Governmental agency and fiscal intermediary held to be in contempt of court for violating automatic stay in recovering pre-petition Medicare overpayments before obtaining relief from the stay). We complimented HHS for its professionalism in seeking court-approval prior to effecting any setoffs or recoupment in *St. Mary.* 89 B.R. at 506–07, 514. It would be inconsistent with our statements there to refrain from condemning the precipitous and opportunistic efforts of HHS to collect pre-pe-

tition obligations from the Debtor evidenced here.

However, we must recognize that, prior to the announcement of our Opinion in *St. Mary* on August 12, 1988, the law of this court addressing the rights of HHS to effect setoffs or recoupment from Medicare-provider-debtors for past overpayments was unsettled. The decision of this court in *In re Ambulance Corp. of America,* 27 B.R. 910 (Bankr.E.D.Pa.1983), could conceivably have been argued to support the conclusion that the conduct of HHS was neither violative of the automatic stay nor contemptuous. Other authority also could have been read to support HHS's actions. *E.g., In re Neuman,* 55 B.R. 702 (S.D.N.Y. 1985); and *In re Monsour Medical Center,* 11 B.R. 1014 (W.D.Pa.1981). We are most reluctant to punish governmental agencies for actions which attempt to preserve the public fisc in an area in which the applicable principles are not settled. *See In re Johnson–Allen,* 69 B.R. 461, 471 (Bankr.E. D.Pa.1987), *rev'd sub nom. Commonwealth of Pennsylvania Department of Public Welfare v. Johnson–Allen,* 88 B.R. 659 (E.D.Pa.1988) (no contempt or § 362(h) penalties imposed upon state for what we held was a wrongful demand for post-petition restitution in a criminal matter). We also note that the Debtors' able counsel was apparently cognizant of, but not motivated to take action to rectify, the conduct of HHS as of February, 1988. This suggests to us that the Debtors' counsel also believed that some of the aforecited cases may have approved the conduct engaged in by BC on behalf of HHS. Similarly, the Committee did not investigate the Debtor's arrangement regarding participation in the Medicare program at this juncture, and was silent concerning the propriety of the Debtor's arrangements with HHS until after the adversary proceeding was under way.

■ On the other hand, we believe that the result of the matters before us was inevitable once our Opinion in *St. Mary* was announced. At that point, HHS could have and we believe should have gracefully accepted that Opinion as setting forth the

applicable law, returned the $15,000.00 payment extracted from the Debtor, and agreed to pay the post-petition benefits due. When a creditor who acted in violation of the automatic stay because it was not aware of the existence of same learns of a bankruptcy filing, its failure to restore the status quo prior to its taking action is a willful act in violation of the stay. *See Grosse, supra,* 84 B.R. at 383; and *Boston Business Machines,* 87 B.R. at 871. There is a policy to be served in encouraging litigants to accept our decisions and refrain from relitigating them without peril of liability. This principle requires us to conclude that HHS should be liable for all costs and attorney's fees expended by the Plaintiffs after August 12, 1988, in support of their position. Therefore, we shall so order.

### D. CONCLUSION

An Order consistent with this Opinion will be entered.

### ORDER

AND NOW, this 7th day of December, 1988, after a consolidated trial of the Motion of the Secretary of Health and Human Services (hereinafter referred to as "HHS") for Relief from the Automatic Stay in the main case and this adversary proceeding on September 22, 1988, it is hereby ORDERED as follows:

1. The Motion of HHS in the main case is DENIED.

2. In the adversary proceeding, judgment is entered in favor of the Plaintiffs and against the agreed only remaining Defendant, OTIS BOWEN, SECRETARY OF THE UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES (hereinafter "HHS"), in substantial part. By agreement of the parties, the other Defendant, BLUE CROSS OF GREATER PHILADELPHIA (HEREINAFTER "BC") is DISMISSED as a party hereto.

3. HHS shall, consequently, pay the following amounts to the Debtor:

a. $15,000.00, plus pre-judgment interest at six (6%) percent per annum from March 4, 1988, to the date that payment is made to the Debtor; and

b. The amount which BC shall calculate, within ten (10) days hereafter, would have been paid to the Debtor for post-petition Medicare benefits but for HHS's attempt to set off or recoup same against past overpayments, plus pre-judgment interest at six (6%) percent per annum from the date that such payments ordinarily would have been payable to the date that payment is made to the Debtor.

4. HHS shall also pay, to both Plaintiffs, reasonable costs and attorneys' fees incurred by them on or after August 13, 1988, in litigation of the adversary proceeding.

5. The parties are directed to confer to resolve the issue of attorneys' fees and costs due to the Plaintiffs' counsel, but, if they are unable to do so, and said counsel have made a reasonable demand, said counsel may file an Application demanding the reasonable attorneys' fees and costs due, including compensation on the fee application if such is necessary, same to be filed within thirty (30) days after entry of this Order, in accordance with *In re Meade Land and Development Co., Inc.,* 527 F.2d 280 (3d Cir.1985); and *In re Mayflower Associates,* 78 B.R. 41 (Bankr.E.D.Pa.1987).